*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* V. L. SIKKELEE, Minor.

UNPUBLISHED
May 15, 2026
10:04 AM

No. 377598
Genesee Circuit Court
Family Division
LC No. 21-137487-NA

Before: KOROBKIN, P.J., and RIORDAN and MARIANI, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating his parental rights to his minor child, VLS, pursuant to MCL 712A.19b(c)(*i*) (conditions that led to adjudication continue to exist) and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

In April 2021, the Department of Health and Human Services (DHHS) filed a petition requesting that the trial court take jurisdiction over VLS, who had been born a few weeks prior, and remove her from her parents' care.[1] DHHS alleged that remaining in her parents' custody presented a substantial risk of harm to VLS's safety and well-being because both parents had been legally adjudicated as cognitively disabled individuals who were unable to care for themselves and correspondingly did not have the ability to independently care for an infant. DHHS alleged that due to the severity of their disabilities, both parents had legal guardians making decisions in all important aspects of their lives, including finances, medical treatment, and living and work arrangements, and that the guardians had contacted DHHS shortly after VLS was born to express concern about the parents' ability to properly care for VLS. DHHS further alleged improper supervision, untreated mental health, and unsuitable housing because, following their investigation

---

[1] VLS's mother was a respondent in the proceedings below and the trial court terminated her parental rights under the same statutory grounds as respondent, but she is not involved in this appeal.

into the guardians' concerns, DHHS determined that neither parent was adhering to safe-sleep practices, respondent was not attending his counseling appointments or taking his psychiatric medications required to treat his other mental-health diagnoses, and the home's kitchen floor was "rotting and weak." Following a preliminary hearing, the trial court authorized the petition, removed VLS from her parents' care and placed her in a nonrelative foster home, and granted both parents supervised parenting time.

Following a combined adjudication bench trial and initial dispositional hearing in May 2022, the trial court assumed jurisdiction over VLS and ordered respondent to comply with a case service plan (CSP) provided by DHHS, which required respondent to participate in and benefit from offered services to address the significant concerns regarding his parenting skills and ability to independently care for VLS, as well as his mental health, housing, and employment. The court also ordered that respondent be provided with accommodations under the Americans with Disabilities Act (ADA), 42 USC 12101 *et seq.*, to ensure that he could meaningfully participate in the services offered to him. The court continued to order that respondent receive such accommodations throughout the proceedings, including after he was removed from his guardianship in early September 2022.

As the proceedings progressed, respondent was largely compliant with his CSP, participating in individual counseling, parenting education, and supportive parenting-time visitation with VLS. Respondent also obtained and maintained employment and housing as required. He struggled, however, to demonstrate progress toward rectifying his primary barrier to reunification: his inability to safely and adequately care for VLS without assistance or supervision. Throughout the proceedings, respondent's caseworker, VLS's guardian ad litem (GAL), and service providers repeatedly expressed concerns regarding respondent's ability to independently care for VLS despite his participation in offered services. As a result, in May 2023, DHHS recommended that the permanency goal be changed from reunification to adoption and that a supplemental petition for termination of respondent's parental rights be filed. The trial court recognized respondent's continued difficulties but refused to change the permanency goal or allow DHHS to file a supplemental petition, stating that respondent must first undergo cognitive, psychological, and neurological assessments so that the court could determine whether respondent had benefitted from his participation in services and whether he was capable of independently caring for VLS on a regular basis.

As the proceedings progressed, DHHS continued to make the same recommendation at each review and permanency-planning hearing, but each time, the court denied the recommendation so that respondent had more time to participate in additional services and demonstrate benefit from them. The court eventually adopted DHHS's recommendation to change the permanency goal to adoption in October 2024, but the court did so as a concurrent goal with reunification so that respondent could continue to participate in services and demonstrate benefit from them. In April 2025, DHHS filed a supplemental petition requesting termination of respondent's parental rights on the basis that respondent, despite participating in additional services, had gotten no closer to being able to safely care for VLS without assistance or supervision. Following a termination hearing in August 2025—at which the proofs and witness testimony primarily focused on respondent's apparent lack of benefit from the services provided to him and his continued inability to safely care for VLS on his own—the trial court found that clear and convincing evidence established grounds for termination of respondent's parental rights

and that a preponderance of the evidence established that termination was in VLS's best interests. The trial court thereafter issued an order terminating respondent's parental rights as previously described. This appeal followed.

## II. REASONABLE EFFORTS

On appeal, respondent first argues that DHHS did not make reasonable efforts toward reunification. Specifically, respondent asserts that he suffered a cognitive disability requiring accommodation under the ADA, and DHHS should have tailored his CSP accordingly. In raising this issue, respondent acknowledges that DHHS provided some ADA accommodations but maintains that those accommodations were "generic" and "minimal," and "did not constitute tailored, disability-specific modifications necessary to enable meaningful participation in services and to demonstrate long-term parenting capacity[.]"

"[W]e review for clear error the trial court's factual finding that [DHHS] made reasonable efforts to reunify [a] respondent[] with the child." *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013) (quotation marks and citation omitted).

In general, when a child is removed from a parent's custody, DHHS must make reasonable efforts toward reunification, except under certain, limited circumstances. *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 3-4; see also MCL 712A.19a(2). Reasonable efforts include "creat[ing] a service plan outlining the steps that both [DHHS] and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Matamoros*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371544); slip op at 4 (quotation marks and citation omitted). DHHS and the trial court must then continually review, update, and revise a parent's CSP as needed throughout the proceedings to ensure that a parent has "a meaningful opportunity to comply with" it. *In re Mason*, 486 Mich 142, 156, 169; 782 NW2d 747 (2010). Correspondingly, alongside DHHS's "responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *Atchley*, 341 Mich App at 339 (quotation marks and citation omitted). "This means a respondent-parent must both participate in services and demonstrate that they sufficiently benefited from the services provided." *Id*. (quotation marks and citation omitted).

"DHHS also has obligations under the ADA that dovetail with its obligations under the Probate Code[.]" *In re Sanborn*, 337 Mich App 252, 263; 976 NW2d 44 (2021) (quotation marks and citation omitted). Although the ADA does not provide a defense to proceedings to terminate parental rights, *In re Terry*, 240 Mich App 14, 24-25; 610 NW2d 563 (2000), it does require DHHS to reasonably accommodate a disabled parent when providing services to achieve reunification and avoid termination of parental rights, *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017), citing 42 USC 12132 and 28 CFR 35.130(b)(7). "[E]fforts at reunification cannot be reasonable under the Probate Code if [DHHS] has failed to modify its standard procedures in ways that are reasonably necessary to accommodate a disability under the ADA." *Hicks/Brown*, 500 Mich at 86. The burden is on the parent to identify other "services that would have been

-3-

appropriate in light of such disability or how the services that were offered were deficient" and to "establish that [he or] she would have fared better if [those] other services had been offered." *Sanborn*, 337 Mich App at 266-267.

The record in this case demonstrates that reasonable efforts were made to provide respondent with services that accommodated his cognitive disability. Respondent's cognitive disability was known to DHHS since the inception of this case, and respondent's CSP was specifically designed with his cognitive disability in mind. The caseworker testified that in April 2021, prior to adjudication and initial disposition, respondent completed a psychological evaluation which indicated that he needed additional assistance due to his cognitive disability and which DHHS used, in part, to guide the services subsequently provided to him. Because of his cognitive disability, respondent was required to (and did) complete an additional psychological evaluation, a cognitive assessment, and a neurological examination to determine the extent of his disability and how it affected his ability to safely parent VLS without assistance or supervision. Respondent was also provided supportive visitation to give him additional parenting assistance during supervised parenting times with VLS, and he was referred to complete a supportive visitation program a second time after the caseworker and service providers determined that he was still struggling with routine parenting responsibilities and required continued support. Respondent was also repeatedly referred to parenting education classes because, even after his completion of them, he continued to struggle with parenting-related tasks and decision-making. DHHS also provided additional services to respondent not ordinarily provided to respondent-parents, including assistance with setting up services and scheduling appointments, constant reminders regarding appointments and parenting times, and transportation to and from services, parenting times, and court hearings as needed.

Respondent also received a significant amount of time—four and a half years since VLS's removal and nearly three and a half years since initial disposition—to participate in and benefit from the services offered to him. As discussed more thoroughly *infra*, respondent participated in his services but remained unable to safely parent VLS without assistance or supervision, thereby failing to uphold his "commensurate responsibility" to engage in *and benefit from* the services offered by DHHS. *Atchley*, 341 Mich App at 339 (quotation marks and citation omitted). The trial court repeatedly made clear throughout the proceedings that respondent was receiving so much additional time because of his cognitive disability, as the court wanted to ensure that respondent received adequate opportunity to participate in more services, complete all the mental assessments required by the CSP, and demonstrate benefit. The court also frequently put respondent under oath at review hearings so that it could further explain what was expected of him given his CSP and confirm on the record that respondent understood these expectations.

Respondent, for his part, has failed to show how these provided services and additional measures throughout the proceedings failed to reasonably accommodate his disability. See *Sanborn*, 337 Mich App at 266-267; *Hicks/Brown*, 500 Mich at 86. Nor has he carried his burden of identifying exactly what other services DHHS should have provided in light of his disability or establishing that he would have fared better had those other services been provided. See *Sanborn*, 337 Mich App at 264, 266-267. Respondent argues that DHHS "failed to accommodate his need for more intensive, longer-term supports," such as "in-home parenting aides, extended supervised visitation, adaptive parenting classes, or respite care." Respondent, however, does not meaningfully substantiate this argument; he offers nothing to demonstrate, for instance, that such

-4-

supports were available, what such supports would have entailed and added to the services and accommodations he was already receiving, and that he would have fared better in overcoming his barriers to reunification with their provision. See *id*. Furthermore, as discussed more thoroughly *infra*, the record reflects that DHHS *did* offer extended supervised visitation to respondent multiple times but ultimately had to reduce the visitation period because respondent was unable to safely parent VLS for those longer periods of time.

Based on the record before us, we see no reversible error in the trial court's conclusion that DHHS made reasonable efforts toward reunification and adequately accommodated his disability when doing so.

## III. TERMINATION OF RESPONDENT'S PARENTAL RIGHTS

Respondent next argues that the trial court clearly erred by finding statutory grounds for termination of his parental rights. Respondent also challenges the trial court's finding that termination was in VLS's best interests.

## A. STANDARDS OF REVIEW

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "We review for clear error both the trial court's decision that a statutory ground for termination has been established and the court's decision regarding the child's best interests." *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 3. Statutory grounds for termination must be found by clear and convincing evidence, and termination must be found to be in the child's best interests by a preponderance of the evidence. *Id*. at __; slip op at 3. As noted, we give deference "to the special ability of the trial court to judge the credibility of witnesses." *In re Pederson*, 331 Mich App 445, 472; 951 NW2d 704 (2020) (quotation marks and citation omitted).

## B. STATUTORY GROUNDS FOR TERMINATION

According to respondent, the trial court clearly erred by finding that clear and convincing evidence supported termination of his parental rights under the cited statutory provisions. We disagree.

A court may terminate parental rights under MCL 712A.19b(3)(c)(*i*) if it finds by clear and convincing evidence that "after 182 days have elapsed, the conditions resulting in adjudication remain present and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." *In re MJC*, 349 Mich App 42, 51; 27 NW3d 122 (2023) (quotation marks and citation omitted). Our Legislature did not intend children to be left in foster care "indefinitely," and so what constitutes a "reasonable time" requires consideration of how long the parent will take to improve the conditions and how long the child can wait for the improvements to occur. *In re Dahms*, 187 Mich App 644, 647-648; 468 NW2d 315 (1991). "[A] trial court may look to the totality of the evidence to determine whether a parent accomplished

-5-

meaningful change in the conditions that led to adjudication." *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022).

In this case, there is no question that well more than 182 days elapsed between the issuance of the initial dispositional order in May 2022 and the issuance of the termination order in September 2025. The primary condition that led to adjudication was respondent's inability to safely care for VLS without assistance or supervision. Based on the totality of the evidence before the trial court at the time of termination, we see no reversible error in the court's conclusion that this condition continued to exist and that there was no reasonable likelihood that the condition would be rectified within a reasonable time considering VLS's age.

The record evidence supported the trial court's finding that respondent had failed to rectify his primary barrier to reunification. The caseworker testified that respondent participated in nearly all his offered supervised parenting time with VLS and was referred to (and had completed) parenting classes three times and supportive visitations twice over the course of approximately four years—but despite completing these services, respondent still had not demonstrated an ability to safely care for VLS. According to the caseworker, respondent relied heavily on his parenting-time supervisors when making parenting decisions, and the supervisors constantly had to redirect respondent to the appropriate course of action when he attempted to make parenting decisions on his own. The caseworker testified that by the time of the termination hearing, respondent still struggled with "day to day parenting" responsibilities, such as "diaper changing, discipline," and basic decision-making, and the individual who oversaw supportive visitations reported that she did not believe that respondent could "parent [VLS] for more than a few hours at a time without causing her harm or emotional distress." That individual also reported that despite respondent's completion of the parenting-education and supportive-visitation programs, she still had serious concerns about respondent's decision-making ability and did not believe that VLS would thrive in respondent's care.

The caseworker also testified that respondent had completed a psychological evaluation, a cognitive assessment, and a neurological examination as required by his CSP, and the corresponding reports indicated that respondent lacked the ability to safely care for VLS without constant supervision and assistance. For instance, the report for the psychological evaluation, which respondent completed in July 2023 after he had participated in his services for over a year, concluded that "it was unsafe to keep [VLS] with" respondent because he had a "low range of decision making skills" and that respondent "needed to be monitored while caring for" VLS. In April 2024, after participating in additional services for nearly another year, respondent completed his cognitive assessment, the report for which concluded that respondent "would be safe with [VLS] for short periods of time" but "could not handle her on [a] long term or 24/7 basis due to his inability to make decisions." The assessment further concluded that respondent could not care for VLS independently and that placing VLS back in his care without constant support and supervision would place VLS at a "significant risk" of harm.

The caseworker testified that significant safety concerns remained throughout the proceedings and that, as a result, respondent never progressed to more than a 90-minute supervised parenting-time session. According to the caseworker, this was based both on the conclusions in the psychological and cognitive assessments that it was not safe to do so and on respondent's failure to demonstrate safe or adequate parenting during his parenting time with VLS.

Additionally, respondent's parenting time was suspended in March 2025, in part due to respondent's increasingly inappropriate behavior at parenting time. Specifically, respondent eventually became "very aggressive" and "verbally abusive towards staff" and VLS's foster parents in front of VLS while at parenting times, which eventually began to negatively affect VLS's emotional well-being and behavior before and after parenting times.

The record evidence also supported the trial court's finding that there was no reasonable likelihood that respondent would rectify this condition within a reasonable time considering VLS's age. See MCL 712A.19b(3)(c)(*i*). As previously indicated, respondent participated in the services offered to him to address his inability to safely parent VLS without assistance, but he failed to demonstrate any benefit from those services during the pendency of this case. The caseworker testified that despite respondent's participation in his services and her belief that respondent tried to the best of his ability to progress toward reunification, he remained unable to safely care for VLS without constant supervision and assistance. Additionally, VLS was only a few weeks old when she was removed and was approximately four and a half years old at the time of the termination hearing. In other words, despite participating in services for more than four years— an undisputedly long amount of time and nearly the entirety of VLS's life—respondent was in no better position to safely care for VLS than when the proceedings began, and there was no evidence indicating that this was going to meaningfully change anytime soon.

On appeal, respondent emphasizes that he participated in and completed the services provided to him by DHHS. But a respondent's "mere participation is not the same as overcoming the barriers in place." *Sanborn*, 337 Mich App at 274. Indeed, participation in and completion of services is not enough if a respondent "fail[s] to demonstrate sufficient . . . benefit from those services specifically targeted to address the primary basis for the adjudication." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). As already discussed, the caseworker testified at the termination hearing that respondent participated in the offered services but that even after more than four years of services, he was still unable to demonstrate that he could safely care for VLS without supervision and assistance. Additionally, the psychological evaluation and cognitive assessment, which were taken at different times during the proceedings and after respondent had participated in and completed multiple services, concluded that respondent could not safely care for VLS for longer periods of time without constant supervision and assistance. The results of these assessments further evidenced that respondent did not benefit from participating in and completing the provided services. See *Sanborn*, 337 Mich App at 274; *Frey*, 297 Mich App at 248.

In sum, the totality of the record before the trial court provided clear and convincing evidence that respondent had not "accomplished meaningful change in the condition[] that led to adjudication" and that there was no reasonable likelihood that he would rectify that condition within a reasonable time given VLS's age. See *Jackisch/Stamm-Jackisch*, 340 Mich App at 334;

-7-

MCL 712A.19b(3)(c)(*i*).  Respondent has failed to show that the trial court reversibly erred in reaching this conclusion.[2]

## C.  BEST-INTERESTS DETERMINATION

Finally, respondent argues that the trial court erred by finding that termination of his parental rights was in VLS's best interests.  We disagree.  Based on the record before us, we see no reversible error in the trial court's best-interests determination.

When determining whether termination is in a child's best interests, the court should place its "focus on the child rather than the parent."  *In re Mota*, 334 Mich App 300, 321; 964 NW2d 881 (2020).  "The trial court should weigh all the evidence available to determine the child's best interests," and it should consider a variety of factors, including "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home."  *Simpson*, ___ Mich App at ___; slip op at 5 (cleaned up).  "Other factors that the court may consider include the parent's history, the parent's psychological evaluation, the age of the child, and a parent's substance-abuse history."  *MJC*, 349 Mich App at 62 (citations omitted).  The court may also consider the parent's ability to provide the child a safe and permanent home, "the parent's compliance with his or her [CSP], the parent's visitation history with the child, the child's well-being while in care, and the possibility of adoption," *id*. (cleaned up), as well as "how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all," *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted).  The court must also expressly consider a child's placement with a relative, which ordinarily weighs against termination.  *Id*. at ___; slip op at 4.

According to respondent, the trial court's best-interests findings were clearly erroneous because the court failed to adequately account for the parent-child bond between respondent and VLS.  The record before us belies this claim.  In its findings, the court expressly stated that it had considered the fact that respondent and VLS had such a bond, noting that it was "very impressive considering the limited amount of time that they've had with each other over the last several years."  The evidence supported this conclusion, as the caseworker testified that respondent had attended nearly every parenting-time session available to him during the proceedings, that VLS called both respondent and her foster father "dad," and that respondent and VLS appeared to have a bond.  Accordingly, the record makes clear that the trial court duly considered respondent's bond with VLS in its best-interests assessment.  While respondent may disagree with how the court ultimately weighed that bond against the many other considerations relevant to VLS's best interests, he has not shown any reversible error in that regard.  See *Simpson*, ___ Mich App at ___; slip op at 3, 5.

---

[2] Given our conclusions regarding this statutory ground for termination, we need not address the trial court's findings under MCL 712A.19b(j).  See *Jackisch/Stamm-Jackisch*, 340 Mich App at 333-334.

Respondent also argues that the trial court failed to adequately consider the possibility of a guardianship with a relative placement as an alternative to termination. See *CJM*, ___ Mich App at ___; slip op at 4; *In re Lombard*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367714); slip op at 6. Again, the record belies this claim. When making its best-interests determination, the trial court expressly noted that, although VLS had been placed in the same nonrelative foster home since her removal approximately four and a half years prior, the court would still address relative placement based on respondent's argument at the termination hearing that there "could be a guardianship" with VLS's paternal grandmother. After considering the evidence before it, the court recognized that a possible guardianship with a relative weighed against termination but nonetheless concluded that a guardianship was not in VLS's best interests, as "there ha[d] been no action taken to seriously consider guardianship" with VLS's paternal grandmother and VLS had "had very limited contact with [the grandmother] during her life." Ultimately, the court concluded that, although the general possibility of a relative guardianship— along with VLS's bond to respondent—may weigh against termination, those considerations were outweighed by "all [the] other evidence . . . in favor of termination," including respondent's continued inability to safely care for VLS without assistance; the significant length of the proceedings; VLS's strong bond with her foster parents and siblings, with whom she had lived her entire life; and the foster parents' expressed desire to adopt VLS.

The record evidence reveals no error in the court's assessment of the possibility of a guardianship. As the court noted in its findings, DHHS had repeatedly investigated VLS's paternal grandmother as a possible relative placement since the start of this case, but it determined that placement with her was not an option because she had a history with Children's Protective Services (CPS) that disqualified her, and even after this CPS history was no longer an issue, she expressly stated that she was not interested in having VLS placed with her. The court also expressly instructed DHHS to again investigate VLS's grandmother for a possible guardianship in April 2024, and DHHS again determined that she was an unfit placement and that she had indicated that she did not want VLS placed with her. DHHS continued to approach VLS's grandmother about a guardianship over the ensuing year and had given her paperwork to establish a guardianship in October 2024 and again in February 2025, but VLS's grandmother never returned the paperwork and eventually stopped responding to the caseworker when she reached out to her about placement or a guardianship. And, as the court noted, VLS's grandmother had only had approximately six to eight hours of contact with VLS throughout VLS's entire life, and the last contact she had with VLS was sometime in 2024 when she had last attended a parenting-time visitation with respondent.

In sum, the record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *Simpson*, ___ Mich App at ___; slip op at 5, and we see no clear error in its findings, *id*. at ___; slip op at 3.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Michael J. Riordan
/s/ Philip P. Mariani

-9-